IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| ROY EVANS, JR., | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Civil Action No. 13-0182-CG-B |
| ANKOR ENERGY, LLC, <u>et</u> <u>al.</u>, | ) ) ) |
| Defendants. | ) ) |

## ORDER

This matter is before the court on the defendants Ankor Energy, LLC's ("Ankor"), Offshore Contract Services, LLC's ("OCS"), and Albert P. Herbert's ("Herbert") motion for summary judgment (Doc. 72), the plaintiff Roy Evans, Jr.'s ("Evans") response (Doc. 84), and the defendants' reply (Doc. 85). For the reasons stated below, the defendants' motion for summary judgment is granted in part and denied in part.

## FACTUAL BACKGROUND

Evans was injured when he fell from a pipe onto a metal platform while attempting to rebolt a flange that was leaking flammable gas on Mobile Bay Rig 870A ("870"). (Doc. 84-2 at 38-39; Doc. 84-27; Doc. 84-28). The 870 is a natural gas platform located seven miles off the coast of Mobile, Alabama in the Gulf of Mexico. (Doc. 84-27 at 4). Subsequent to the incident, Evans filed a claim for and has received workman's compensation benefits under the Longshoreman and Harbor Worker Compensation Act ("LHWCA"). (Doc. 84 Ex. K).

On March 8, 2012, Evans completed four Management of Change ("MOC") Forms including the replacement of the flow safety valve on the fuel gas scrubber. (Doc. 72 Ex. D). The Production Superintendent for Ankor, Eddie St. Martin ("St. Martin") approved these jobs. (Doc. 72 Ex. E at 47; Doc. 72 Ex. F). On the same day, Evans also completed a Job Safety Analysis ("JSA") Form for the replacement of the flow safety valve detailing the sequence of the basic job steps and potential hazards for submission to Ankor. (Doc. 72 Ex. A at 17; Doc. 72 Ex. G). The JSA noted that Evans would remove the old flow safety valve and that he possessed "stop work authority." Id.

On March 9, 2012, Evans, Herbert and Matthew Bluffin ("Bluffin") (a mechanic on the platform employed by Wood Group Production Services, Inc. ("Wood Group")) attended a safety meeting where they received the JSA and discussed the day's tasks including the replacement of the flow safety valve. (Doc. 72 Ex. A at 27; Doc. 72 Ex. H). During the conclusion of the safety meeting, a supply ship arrived at the 870 to offload water. (Doc. 72 Ex. A at 27). Evans and Bluffin assisted the crew in offloading the water while Herbert worked near the fuel gas scrubber on the platform above. (Doc. 72 Ex. A at 33). After offloading the water, Evans proceeded to the platform area. (Doc. 72 Ex. A at 35; Doc. 72 Ex. E at 38-39).

Once Evans reached the top of the stairs, he noticed that Herbert had already cut and removed the bolts from the flange to replace the valve on the non-isolated gas vent line contrary to the discussed work plan documented in the safety meeting. (Doc. 72 Ex. A at 35; Doc. 84-27 at 4). This created an extremely dangerous

situation as the loosened flange began leaking highly flammable liquid and gas hydrocarbon. (Doc. 84-27 at 4). Threatened by the potential of a platform fire, Evans and Bluffin attempted to secure the leak by rebolting the flange. (Doc. 84-2 at 38-39; Doc. 84-27; Doc. 84-28). Evans sustained an injury when his open-ended wrench either slid off the nut or the bolt broke, causing him to slip off the pipe on which he was standing and fall onto the metal platform below. (Doc. 72 Ex. A at 48-50; Doc. 72 Ex. J). Evans received medical attention once transported to shore. (Doc. 72 Ex. A at 60).

Ankor purchased the 870 in January 2012, three months before the accident. (Doc. 72 Ex. A at 11). Pursuant to separate contracts with Ankor, Wood Group and OCS agreed to "perform certain work or furnish certain services" to Ankor. (Doc. 72 Ex. B, C). The second provision of Ankor and Wood Group's contract essentially says that no employee of Wood Group is to be deemed for any purpose the agent, servant or representative of Ankor.[1] Provision 4 of the contract requires Wood Group to

---

[1] Provision 2 reads in full:

> It is expressly understood that Contractor is an independent contractor and that neither Contractor nor Contractor's principals, partners, employees, or subcontractors, are servants, agents or employees of Ankor. As an independent contractor, Contractor agrees to comply with all laws, rules and regulations, whether federal, state or municipal, which now or in the future, may be applicable to all service or work performed hereunder or applicable to Contractor's business, equipment or employees engaged in or in any manner connected with its performance hereunder. Further and subject to Section 4 herein, Contractor, as an independent contractor, assumes full responsibility for loss of or damage to its materials, machinery, equipment or other property while performing hereunder, provided that Contractor's responsibility for loss of or damage to materials which are subject of a sale to Ankor shall cease upon delivery of such material to Ankor's drilling rig, well site or its other job site, or other point of delivery as specified by Ankor.

3

defend, indemnify and hold Ankor harmless from and against any losses, costs, expenses and causes of action, including legal fees, for injuries to and death of Wood Group's employees.[2] The contract obligates Wood Group to perform all jobs with due diligence and in a good and workmanlike manner.[3] Additionally, the contract provides that "[a]ny waiver, alteration or modification of any provisions of this contract shall not be valid unless in writing and signed by the parties." (Doc. 84-29 ¶ 15).

Evans possessed 20 years experience in the field including twelve years employed by Wood Group as a Lease Operator on the 870. (Doc. 85-1 at 7-8, 48, 68; Doc. 84-27 at 4). Evans would complete a MOC Form detailing what jobs he planned to complete, which was signed off by Herbert, who was employed by OCS as the

---

(Doc. 84-29 ¶ 2).

[2] Provision 4(b) reads in full:

> Contractor agrees to release, defend, indemnify, and hold Ankor harmless from and against any and all claims, demands, causes of action, suits, losses, damages, costs (including legal fees), expenses and liabilities of every kind and character arising directly or indirectly in connection herewith for: (1) personal injury, illness or death of any member(s) of contractor; and/or (b) loss or damage to property of any member(s) of contractor.

(Doc. 84-29 ¶ 4(b)).

[3] Provision 1 provides in pertinent part:

> The jobs contemplated are any such work or services performed by Contractor in the scope of its usual business. Contractor, after acceptance of an Ankor request, will begin each particular job at such time as is agreed upon between Contractor and Ankor's representatives and, once having commenced any such job, Contractor will perform all such services or work in a good and workmanlike manner in accordance with the terms hereof.

(Doc. 84-29 ¶ 1).

4

platform's acting Foreman and Lead Lease Operator, and then submitted to Ankor for approval. (Doc. 84-27 at 4; Doc. 84-82 at 75). Ankor contends that this decision-making authority shows that they ultimately exercised control over Evans' work on the 870.[4]

According to Evans' supervisor at Wood Group, Cormier Evans ("Cormier"), Ankor never gave any Wood Group employee instructions on how to perform a job.

---

[4] To support this contention Ankor relies on St. Martin's deposition testimony that Evans' work on a day-to-day basis "was supervised or monitored by Ankor" and that Ankor possessed the final say of what jobs were to be performed on the 870. (Doc. 84-26 at 24, 26). Ankor also points to Douglas Schaefer's ("Schaefer"), OCS' Production Manager, testimony regarding the amount of control Ankor had over its workers on the 870:

> Q: Who oversaw the Ankor account?
>
> A: Basically, I was still in charge of it. But it was just – mainly with Ankor, we were just dealing with payroll, you know. That's pretty much all we had done. We didn't – we didn't deal with the everyday aspects of any of the operations.
>
> Q: You weren't hands on with the operations on a day-to-day basis?
>
> A: No.
>
> Q: But with Emerald you were?
>
> A: With Emerald, I am, yes.
>
> Q: Okay. All of my questions are gong to be related to March of 2012, just for purposes of clarity so we are on the same page. But on a day-to-day basis, did you have hands on involvement with the OCS employees that were contracted to Ankor?
>
> A: No.
>
> Q: Okay. Who would have that contact within the OCS employees?
>
> A. Ankor.

(Doc. 84-32 at 6-7). Ankor argues that although Evans was not a formal employee of OCS like Hebert, it's only logical that Ankor controlled both Hebert's and Evans' work on the 870.

(Doc. 84-23 at 40). Evans testified that Ankor "would make a decision whether it was feasible or safe or if they thought it was cost conscious or whatever," but "[t]hey never controlled us as far as making the decision and/or how to do a particular job." (Doc. 84-1 at 25). Evans wore a Wood Group uniform while working on the 870, received safety training from Wood Group, and was paid by Wood Group. (Doc. 72 Ex. K, ¶ 26). Evans determined what tools and equipment he needed and created requisition orders for the items to be billed to Ankor. (Doc. 84-2 at 2). Ankor also provided Evans with food, water and lodging while he was on the 870. (Doc. 84-31 at 6-7). While Ankor could not terminate Evans' employment with Wood Group, Ankor could ask that another offshore worker replace Evans.

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted, "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" Bailey v. Allgas, Inc., 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting Anderson, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at

6

249-250 (internal citations omitted).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." See Anderson, 477 U.S. at 251-252. The moving party bears the burden of proving that no genuine issue of material fact exists. O'Ferrell v. United States, 253 F.3d 1257, 1265 (11th Cir. 2001). In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999). "If reasonable minds might differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Hinesville Bank v. Pony Exp. Courier Corp., 868 F.2d 1532, 1535 (11th Cir. 1989) (citing Mercantile Bank & Trust v. Fidelity & Deposit Co., 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(a), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Co., 32 F.3d 520, 524 (11th Cir. 1994)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)). Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The non-moving party "may not rely merely on allegations or

denials in its own pleading; rather, its response...must be by affidavits or as otherwise provided in this rule be set out specific facts showing a genuine issue for trial." Vega v. Invesco Group, Ltd., 2011 WL 2533755, *2 (11th Cir. 2011). "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted). "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotation and citation omitted).

## LEGAL ANALYSIS

### A. Immunity under the LHWCA and Borrowed Employee Status

Evans is a longshoreman and is being paid benefits under the LHWCA, thus the LHWCA provides tort immunity for his employer:

> (a) The liability of an employer [for compensation benefits] shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, defendants, next of kin, and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death, except that if an employee or his legal representative in case death results from injury may elect to claim compensation under the chapter, or to maintain an action at law or in admiralty for damage on account of such injury or death . . .
>
> (b) In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise

8

> entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void.

33 U.S.C. § 905 (a) & (b).

Even though Evans technically was an employee of Wood Group, Ankor contends that this immunity can extend to Ankor since it borrowed Evans from Wood Group and thus effectively became Evans' employer.[5] In Ruiz v. Shell, 413 F.2d 310 (5th Cir. 1969), the Fifth Circuit Court of Appeals set forth nine factors to consider when determining whether LHWCA tort immunity is extended to an employer under the borrowed servant doctrine:

(1) who has control over the employee and the work he is performing;

(2) whose work is being performed;

(3) whether there is an agreement between the original and borrowed employers;

(4) whether the employee acquiesces to the new work situation;

(5) whether there was a temporary termination by the general employer of the relationship with the servant;

(6) who provides the instruments and place for performance of the work;

(7) whether the employment of the servant is for a considerable length of time;

(8) who had the right to discharge the employee; and

---

[5] The defendants' motion for summary judgment makes no arguments concerning liability other than that Evans was a borrowed servant of Ankor. However, Evans' response to the defendants' motion for summary judgment discusses how he has established liability of Ankor and OCS. The court finds it unnecessary to address this contention.

9

(9) who had the obligation to pay the employee.

Id. at 312-13. The court explained that although these factors have been given great weight, "no one of these factors, or any combination of them, is decisive, and no fixed test is used to determine the existence of a borrowed-servant relationship. . ." Id. at 312.

**1. Control over the employee**

"The factor of control is perhaps the most universally accepted standard for establishing an employer-employee relationship." Ruiz, 413 F.2d at 312. "To determine who has control over the employee, the court is required to distinguish 'between authoritative direction and control, and mere suggestion as to details or the necessary cooperation, where the work furnished is party of a larger undertaking.'" Robertson v. W & T Offshore, Inc., 712 F. Supp. 2d 515, 528-29 (W.D. La. 2010) (quoting Standard Oil Co. v. Anderson, 212 U.S. 215, 222, 29 S.Ct. 252, 254, 53 L.Ed. 480 (1909)). The control factor does not "require that the borrowing employer direct each and every action taken by the borrowed employee." Magnon v. Forest Oil Corp., 2007 WL 2736612, at * 4 (W.D. La. Sept. 18, 2007). "A borrowing employer is not required to micro-manage a borrowed employee in every assigned task." Id.

Wood Group furnished Evans' services as a Lease Operator to Ankor under a "Master Service Agreement" which states that Evans was employed as an independent contractor. Evans argues as a skilled offshore worker who knew the tasks he would be required to perform on the platform, only he controlled what jobs

to perform and how to perform them. Evans also contends that as Lead Foreman, Herbert's main job was to keep Ankor apprised of what was happening on the 870 and that he did not control any of Evans' activities or tell Evans what to do. Thus, Evans contends that Ankor did not provide him any instructions regarding his job and instead, he controlled his own work according to the instructions he received from Wood Group as the day-to-day operations continued as they had before Ankor purchased the platform.

The defendants disagree. St. Martin testified that Evans' day-to-day work was supervised and monitored by Ankor. In response to Evans' interrogatories, Ankor, OCS and Herbert stated that Ankor supervised and controlled Evans' and Herbert's work on the 870. See Doc. 72 Ex.K ¶ 26; Ex. M ¶ 27; Ex. N ¶ 24. Although Evans conducted the JSA meeting each morning and planned what jobs to complete next, Ankor retained the ultimate authority on whether to approve or disapprove the proposed jobs submitted by Evans.[6] In fact, Ankor approved the replacement of the flow safety valve at issue without shutting down the platform via an email between Herbert and St. Martin.

Considering the facts in the light most favorable to the plaintiff, the court finds that the evidence conflicts as to whether Ankor had authoritative direction

---

[6] Evans described that as part of his relationship with clients he would "identify problems and things that needed to be fixed." (Doc. 84-2 at 3). He also attached an email he sent to one of Wood Group's clients illustrating how he "would let the customer know what [his] thoughts were, [his] suggestions and procedure to remedy the problem (here a grocery box that was unsafe) and how [he] would communicate [his] thoughts to Wood Group." Id.; See Doc. 84-21. However, this evidences mere suggestions and necessary cooperation rather than authoritative control.

11

and control over Evans' work.

**2. Whose work was being performed**

It is undisputed that Evans was performing Ankor's work. Accordingly, this factor weighs in favor of borrowed employee status.

**3. Agreement between the employers**

There is no question that the signed contract between Ankor and Wood Group provided that Wood Group's employees were independent contractors. See Doc. 72 Ex. D. Although the contract specifically calls for Wood Group to be an independent contractor, the Fifth Circuit has held that such provisions do not automatically negate borrowed employee status. See Brown v. Union Oil Co. of California, 984 F.2d 674, 677-78 (5th Cir. 1993); Melancon v. Amoco Prod. Co., 834 F.2d 1238, 1245 (5th Cir. 1988). "The reality at the work site and the parties' actions in carrying out a contract…can impliedly modify, alter or waive express contract provisions." Melancon, 834 F.2d at 1245. In Melancon, the court held that the language of the contract provision did not defeat borrowed employee status when the nominal employer clearly understood that the plaintiff would take his instructions from the borrowed employer. See Id.

As the court discussed above, the evidence conflicts as to who had authoritative direction and control over the plaintiff. Thus, the court finds that there is a genuine issue as to whether Wood Group's authority over Evans was altered by the reality of the work site. See Melancon, 834 F.2d at 1245.

**4. Acquiescence**

"The focus of this factor is whether the employee was aware of his working conditions and chose to continue working in them." Brown, 984 F.2d at 678 (citing Melancon, 834 F.2d at 1245 & n.13). Evans argues that there was "no new work situation" after Ankor purchased the 870 because things operated on the platform as they had before. However, Evans understood that Ankor purchased the platform, and continued to work, sleep and eat on the 870 for several months. See Brown, 984 F.2d at 678 (finding that one month is a sufficient amount of time to appreciate working conditions). Consequently, this factor favors borrowed employee status.

**5. Termination**

A "finding of borrowed employee status does not require that the lending employer completely sever its relation with the employee." In re Knudsen, 710 F. Supp. 2d 1252, 1266 (S.D. Ala. 2010) (citing Melancon, 834 F.2d at 1246; Capps v. N.L. Bariod-NL Industries, Inc., 784 F.2d 615, 617-18 (5th Cir. 1986)). "The focus instead is on the leading employer's relationship with the employee while the borrowing occurs." Id. Here, Evans wore a Wood Group uniform while working on the 870. Evans remained in contact with his superiors at Wood Group, followed any safety alerts put out by Wood Group, and used the skills he gained through certification by Wood Group to perform his work. Although Ankor ultimately determined and approved what tasks Evans performed on the 870, Evans' continued contact with Wood Group suggests that the relationship between them remained intact. Accordingly, this factor weighs against a finding of borrowed

servant status.

**6. Tools and place of performance**

It is undisputed that Ankor furnished the place of employment, meals, lodging and transportation to and from work on the 870. Ankor also provided Evans with the tools he needed for work. When Evans needed equipment to complete a job, he submitted a requisition order for the items to be billed to Ankor. The court finds this factor favors borrowed servant status.

**7. Length of employment**

The Fifth Circuit has found that "[w]here the length of employment is considerable, this factor supports a finding that the employee is a borrowed employee," but that "the converse is not true." Capps, 784 F.2d at 618. In Billizion v. Conoco, Inc., 993 F.2d 104, 106 (5th Cir. 1993), the Fifth Circuit found this factor to be neutral when the plaintiff had worked for Conoco for more than three months. Similarly, because Evans was involved with Ankor for roughly three months, the court finds this factor is neutral.

**8. Right to discharge**

It is undisputed that Ankor could not discharge Evans from his employment with Wood Group. Wood Group admits, however, that Ankor had the right to discharge him from Ankor's platform and job site. The Fifth Circuit has found that "[t]his arrangement is sufficient to support a finding of borrowed employee status."

Brown, 984 F.2d at 679 (citing Melancon, 834 F.2d at 1246; Capps, 784 F.2d at 618). As such, this factor weighs in favor of borrowed employee status.

**9. Obligation to pay**

Wood Group paid Evans for the time he worked on the 870 for Ankor. Wood Group also provided Evans worker's compensation insurance and has been paying his medical bills and lost wages. Accordingly, this factor weighs against finding borrowed servant status.

**Conclusion**

For the reasons stated above, the court finds that there are genuine fact issues in dispute as to the Ruiz factors, and as such, summary judgment is not proper as to whether Evans was Ankor's borrowed employee. Accordingly, the defendants' motion for summary judgment is denied as to the tort claims (Counts I and II).

**B. Breach of Contract Claims**

The defendants also argue that the breach of contract claims fail because Evans is not a signatory to the contracts at issue. Although Evans contends that he has only raised tort claims against the defendants, review of the second amended complaint (Doc. 66) indicates he asserted breach of contract claims against OCS (Count III) and Ankor (Count IV). The court interprets Evan's failure to defend these claims as his abandoning them. Thus, the defendants are entitled to summary

15

judgment on Counts III and IV.

## CONCLUSION

After due consideration of all matters presented and for the reasons set forth herein, it is hereby **ORDERED** that the defendants' motion for summary judgment (Doc. 72) is **GRANTED IN PART** as to the breach of contract claims (Counts III and IV) and **DENIED IN PART** as to the tort claims (Counts I and II).

**DONE** and **ORDERED** this 28th day of March, 2014.

/s/ Callie V. S. Granade
UNITED STATES DISTRICT JUDGE